USCA No. 14-30180, 14-30183, 14-30184, 1430185

USDC No. CR-13-91-BLW
(District of Idaho)

_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MARK A. ELLISON, DAVID D. SWENSON, JEREMY S. SWENSON,
and DOUGLAS L. SWENSON

Defendants-Appellants.

_____

Appeal from the United States District Court
for the District of Idaho (USDC No. CR-13-91-BLW)
Honorable B. Lynn Winmill, District Court Judge

_____

**APPELLANT MARK A. ELLISON'S**

**SUPPLEMENTAL INDIVIDUAL OPENING BRIEF**

_____

JEFFERY P. ROBINSON                    Attorney for Defendant-Appellant,
SCHROETER, GOLDMARK & BENDER           Mark A. Ellison
810 Third Avenue, Suite 500
Seattle, Washington  98104
Telephone:  (206) 622-8000

# TABLE OF CONTENTS

**<u>Page</u>**

JURISDICTIONAL STATEMENT ..................................................................1

STATEMENT OF ISSUES ...........................................................................1

STATEMENT OF THE CASE .......................................................................2

    I.    Factual Background ....................................................................2

    II.   The Criminal Investigation ........................................................2

    III.  The Evidence Regarding Mr. Ellison ..................................8

    IV.  Exculpatory Testimony .......................................................15

    V.   Jury Instructions, Verdict, and Post-Trial Proceedings ....................15

SUMMARY OF ARGUMENT.....................................................................18

STANDARD OF REVIEW............................................................................19

ARGUMENT.................................................................................................20

    I. Mr. Ellison's Convictions Should Be Reversed Because the
      Government Failed to Offer Sufficient Evidence to
      Convict Mr. Ellison of Securities Fraud.............................................20

        A.    The Securities Fraud Counts Required Proof that
             Mr. Ellison Acted Willfully ......................................23

        B.    The Government Failed to Present Sufficient
             Evidence That Mr. Ellison Acted Willfully............................24

      II.The District Court Erred in Refusing To Give
         Defendants' Proposed Good Faith Instruction ....................................27

**<u>Table of Contents, continued</u>**

                                                                    <u>**Page**</u>

III.    The District Court Abused Its Discretion When It
        Refused to Allow Any Questions About Jurors Bias
        Towards Members of the LDS Faith ...................................................32

        A.    The Most Powerful Evidence of Bias Relating to LDS
              Members Was Fact Based and from a Credible Source.............35

        B.    The Decision in *United States v. Anekwu*,
              695 F.3d 967 (9th Cir. 2012) Provides No Assistance to
              the Government Because the Factual Record is
              Different in Several Key Areas ...................................................37

        C.    Evidence of Impact of District Court's Abuse of
              Discretion in Failing to Allow Questions...................................42

CONCLUSION ........................................................................................43

JOINDER IN ADDITIONAL ARGUMENTS BY CO-APPELLANTS ...............45

STATEMENT OF RELATED CASES ...................................................46

CERTIFICATE OF COMPLIANCE.......................................................47

CERTIFICATE OF SERVICE ...........................................................48

# TABLE OF AUTHORITIES

**Page**

<u>**Cases**</u>

*Ajoku v. United States*,
134 S.Ct. 1872 (2014) ....................................................... 18, 19, 30, 31

*Bryan v. United States*,
524 U.S. 184 (1998) ...........................................................................30

*Chapman v. California*,
386 U.S. 18 (1987) .............................................................................34

*Jackson v. Virginia*,
443 U.S. 307 (1979) ..................................................................... 20, 21

*Rosales-Lopez v. United States*,
451 U.S. 182 (1981) ...........................................................................32

*Sullivan v. Louisiana*,
508 U.S. 275 (1993) ...........................................................................34

*United States v. Ajoku*,
718 F.3d 882 (9th Cir. 2013) ........................................................ 30, 31

*United States v. Alarape*,
969 F.2d 349 (7th Cir. 1992) ..............................................................39

*United States v. Baldwin*,
607 F.2d 1295 (9th Cir. 1979) ............................................................33

*United States v. Corey*,
625 F.2d 704 (5th Cir. 1980) ..............................................................40

*United States v. Daily*,
139 F.2d 7 (7th Cir. 1943) ............................................................ 34, 39

*United States v. Dellinger*,
472 F.2d 340 (7th Cir. 1973) ........................................................ 39, 40

*United States v. Dixon,*
201 F.3d 1223 (9th Cir. 2000) ............................................................28

*United States v. Esquivel-Ortega*,
484 F.3d 1221 (9th Cir. 2007) ..................................................... 23, 24

*United States v. Franklin*,
321 F.3d 1231 (9th Cir. 2003) ............................................................20

*United States v. Goyal*,
629 F.3d 912 (9th Cir. 2010) ..................................................... 24, 25, 26

iii

Table of Authorities, continued

**Page**

*United States v. Jones*,
  722 F.2d 528 (9th Cir. 1984) ............................................................33

*United States v. Kessi*,
  868 F.2d 1097 (9th Cir. 1989) ...........................................................29

*United States v. Knapp*,
  120 F.3d 928 (9th Cir. 1997) ............................................................28

*United States v. Munoz*,
  233 F.3d 1117 (9th Cir. 2000) ...........................................................20

*United States v. Nevils*,
  598 F.3d 1158 (9th Cir. 2010) ........................................... 20, 21, 24

*United States v. Patterson*,
  292 F.3d 615 (9th Cir. 2002) ............................................................20

*United States v. Robinson*,
  475 F.2d 376 (D.C.Cir. 1973), ....................................................... 33, 34

*United States v. Shipsey*,
  363 F.3d 962 (9th Cir. 2004) ............................................................28

*United States v. Tarallo*,
  380 F.3d 1174 (9th Cir. 2004) ...........................................................31

*United States v. Toomey*,
  674 F.2d 678 (9th Cir. 1985) ............................................................33

United States v. Anekwu,
   695 F.3d 967 (9th Cir. 2012) ....................................... 36, 37, 38, 39

*United States v. Williams*,
  990 F.2d 507 (9th Cir. 1993) ...........................................................29

**Statutes**
18 U.S.C. 1001 ......................................................................... 41, 42
18 U.S.C. § 1035 ...................................................................... 40, 41, 42
18 U.S.C. § 3231 ..........................................................................1
28 U.S.C. § 1291 ..........................................................................1

**Rules**
Fed. R. App. P. 4(b)(1) ....................................................................1

## JURISDICTIONAL STATEMENT

Mark Ellison appeals a judgment of conviction in the United States District Court for the District of Idaho. The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291. The district court's judgment was entered on August 25, 2014. The notice of appeal was timely filed on September 2, 2014. *See* Fed. R. App. P. 4(b)(1).

## STATEMENT OF ISSUES

1. Is Mr. Ellison entitled to acquittal on all counts because the government failed to introduce sufficient evidence to allow a rational juror to find that he willfully committed securities fraud?

2. Did the district court err in failing to give a jury instruction on good faith because the instructions given, including the instruction defining the term "willfully," were inadequate regarding the intent required for conviction of securities fraud?

3. Did the district court err in refusing to allow any questions about jurors' bias toward members of the LDS faith?

1

## STATEMENT OF THE CASE

### I.  Factual Background[1]

Mark Ellison and Doug Swenson were among the original founders of DBSI, working together for over a decade to build the company.  AER 238.  In 1992, Mr. Ellison sold his interest in DBSI to go into private legal practice.  *Id.* Over the next twelve and a half years, Mr. Ellison practiced law as a respected lawyer in the Boise community.  In October 2004, Mr. Ellison returned to DBSI as general counsel.  *Id.*  In his role, Mr. Ellison oversaw both the legal and compliance departments of DBSI, supervising numerous other attorneys.  JER 2941, 5193.

### II.  The Criminal Investigation

The government began its criminal investigation into DBSI's failure in May 2009.  JER 6180.  The investigation was conducted by the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service ("IRS").  *Id.*  The government chose FBI Special Agent Rebekah Morse to testify about the investigation even though she did not start with the investigation until December

---

[1] This section also incorporates by reference the facts from the Appellants' Joint Opening Brief.  The details of the criminal investigation of Mr. Ellison are also included.

2010.  JER 6179-6180.  Significant flaws in the investigation were revealed during her testimony.

Agent Morse interviewed Mr. Ellison on March 15, 2012.  JER 6181-6182. Special Agent Keith Tippets, Assistant United States Attorney George Breitsameter, Department of Justice Tax Attorney Mark Williams, and numerous other individuals, in addition to Mr. Ellison and his attorney David Nevin, were present.[2]  JER 6182.  Mr. Ellison had no access to DBSI documents since he left DBSI and was not shown any documents during the nearly four hour interview. JER 6224-6225.  Agent Morse testified that Mr. Ellison said he did not attend asset management meetings.   JER 6186-6187.   Mr. Ellison's attendance at these meetings was important to the government theory and there was evidence that he attended at least some of these meetings.  JER 4132.  His alleged denial was offered to suggest that he was attempting to lie about attending these meetings.

Defense counsel demonstrated at a side bar conference that Agent Morse's testimony was contradicted by her report of the meeting, and the government corrected her testimony.  JER 6206-6216.  Agent Morse admitted Mr. Ellison was asked about "a periodic meeting with regard to the master lease program" and she

assumed these meetings were asset management meetings even though she never asked him about that. JER 6216, 6227-6229. One of the government's key witnesses, Gary Bringhurst, attended asset management meetings and testified Mr. Ellison was not a frequent attendee. JER 4132.

Before indictment, the government gave Mr. Ellison's counsel David Nevin a paper copy of an email (Trial Exhibit 5859 now numbered and hereinafter "AER 4662"). The government claimed it was an email from Mr. Ellison to DBSI's Senior Director of Sales and Operations, Josh Hoffman. JER 6200. Agent Morse testified to this "fact" in the grand jury (JER 6200-6201) and told the grand jury Mr. Ellison intended to tell Mr. Hoffman to "continue to push sales" and "continue to promote sales to investors," even though the email did not use those words. JER 6239-6240, 6381-6383. Agent Morse's admission that "you know, it wasn't the best articulation, perhaps, to use 'push sales'" (JER 6383) was significant because the grand jury was not shown the actual email – they only heard Agent Morse's interpretation of the email. JER 6385. The superseding indictment contained the allegation that Mr. Ellison sent the email and Morse's interpretation of it. JER

---

[2] Mr. Nevin was Mr. Ellison's original counsel in this case prior to current counsel's involvement. JER 6252. Mr. Nevin continued to act as local counsel in Mr. Ellison's case; however, primary representation was taken over by Mr. Ellison's current counsel. JER 6255.

6240-6241. This was the only overt act attributed to Mr. Ellison in the indictment. AER 658-718.

The email AER 4662 had been altered, concealing significant exculpatory information. AER 4662 contained a statement DBSI was planning to use to answer inquiries about the June 30, 2008 financial statements (JER 3272-3274, 6195-6197) and appeared to have been sent by Mr. Ellison to Mr. Hoffman. Agent Morse testified that the government received a hard copy of the email from the bankruptcy trustee pursuant to a subpoena for the records of DBSI employee Josh Hoffman. JER 6193-6194, 6230.

The bankruptcy trustee produced a hard drive containing approximately 625,000 emails (JER 6192), including an electronic version of the paper email referred to above (Trial Exhibit 5859, now AER 4660-4661). This electronic email was nearly identical to AER 4662 in content; however, AER 4660-4661 shows (1) it was part of a chain that began with Mr. Hoffman emailing Mr. Ellison a draft of the draft statement; (2) there was a gap of seven days between Mr. Ellison receiving the email and responding with "looks good to me," during which time Mr. Ellison sent and received numerous emails discussing the content of the draft statement in Hoffman's original email; (3) the people approving the language before Mr. Ellison included CPA Matthew Duckett (JER 5189) who at the time

5

was DBSI's Director of Accounting (JER 5192), CPA Paris Cole who was DBSI's Controller (JER 5624), DBSI employees Gary Bringhurst, Merriah Harkins, John Mayeron, Paul Lambert, and Wade Thomas. Ten emails were exchanged among nine DBSI employees reviewing the financial statement language. *See,* AER 4668-4669, 5467, 4670-4673, 4674-4676, 4679-4681, 4698, 4686-4688, 4677-4678, 4862, 4689-4691; JER 6245-6247, 6262-6272, 6342-6357. All of the emails showed unanimous support for the language prior to Mr. Ellison's response "looks good to me," but none of these emails were presented to the grand jury. *Id.*; JER 6385.

Agent Morse admitted that she had never seen AER 4660-4661 – the unaltered electronic version of the altered, paper copy email – prior to opening statements, even though it was in the discovery she helped review and the same discovery provided to the defense. JER 512-515, 6198, 6234-6235, 6263. Finally, Agent Morse testified that she never looked for additional emails in this chain even though the wording of the subject line indicated that there were in fact additional emails. JER 6231.

Despite interviewing Mr. Hoffman numerous times, the government never asked him about the authenticity of AER 4662 until after Mr. Ellison's opening

statement at trial, when the truth about the altered email was discussed. JER 512-515, 6233-6235, 6239.

Agent Morse admitted that numerous documents she had never seen before were introduced at trial, even though the documents were in the database possessed by the government and reviewed by the agents on the case. JER 6368-6370, 6373, 6411-6412, 6487.

Finally, Agent Morse committed perjury while testifying at trial. During a break, a juror informed the district court judge that Agent Morse was using her cell phone during a sidebar conference. JER 6475. When asked if she was sending text messages, Agent Morse responded that she was inputting a password to turn off the ringer. *Id.* The district court judge reminded her that she was under oath. She repeated that she was not texting. JER 6476. The district court informed the jury that Agent Morse said she was just turning off her phone, and counsel for Doug Swenson resumed cross-examination. JER 6480-6481. The district court judge then recalled that the juror said he/she saw Agent Morse using the phone on multiple occasions during the sidebar (JER 6494-6495) and ordered Agent Morse to turn over her cell phone to the court. JER 6550-51.

Upon arrival in court the following morning, the jury was informed that a "personal tragedy" had occurred with one of the witnesses. JER 6559. The

attorneys were informed that Agent Morse committed suicide earlier that morning. JER 6574; JER 6579-80; JER 6613; JER 6785.

Examination of the cell phone revealed that Morse was texting on the stand. JER 6788. She sent several messages to her husband, including one stating "[w]ell I fucked up once. I will get reamed for it, I'm sure," to which her husband responded "[t]hey'll fix it on redirect. Stop worrying so much." JER 6788-6789. The district court, after hearing argument, gave an instruction to the jury letting them know Agent Morse did not tell the truth and allowing them to consider this when evaluating her credibility. JER 6810, 8054.

After a forty-four day trial, the jury convicted Mr. Ellison of forty-four counts of securities fraud and acquitted him on all other counts. The court denied Mr. Ellison's motion for judgment of acquittal. Mr. Ellison was sentenced to five years imprisonment and ordered to pay $32,158,501 in restitution. AER 1-6. Mr. Ellison is currently out on bail during the pendency of this appeal.

### III. The Evidence Regarding Mark Ellison

Mark Ellison was tried for conspiracy to commit securities fraud, securities fraud, and wire fraud.[3] JER 1-79, DJMSER 4-6. The government's general theory

---

[3] Mr. Ellison was acquitted of conspiracy, all wire fraud counts, and was not found guilty of committing securities fraud by making an untrue statement of material fact and by failing to disclose a material fact. AER 382-431.

was that DBSI was a "failing venture capital company" that defrauded investors by using misleading PPMs to convince them to buy TIC investments when the only money sustaining DBSI was new investor money. JER 245, 261-287, 8299-8304. The government alleged that the PPMs contained misleading statements and material omissions to persuade people to buy DBSI products. JER 261-287.

The government's trial theory rested on five alleged frauds (JER 8170-8226): (1) the claim that DBSI Master Leaseco had $15.4 million dollars in cash or otherwise immediately available assets was false because this money was not actually available; (2) DBSI misused accountable reserves; (3) DBSI misrepresented the Master Lease portfolio as sustaining itself when it was cash flowing negative; (4) DBSI falsely claimed a net worth of $105 million dollars made up of loans owed to DBSI by tech companies netted against the monies DBSI owed to its note and bond holders; and (5) DBSI failed to disclose an accurate financial position following the Spectrus sales shutdown. *Id.*

Even viewed in the light most favorable to the government, the evidence failed to implicate Mr. Ellison's complicit participation in any of the five alleged frauds.

**Alleged Fraud No. 1: DBSI's claim that DBSI Master Leaseco had $15.4 million dollars in cash or otherwise immediately available assets.** No

document or witness provided evidence that Mr. Ellison had knowledge about money moving into and out of the Master Leaseco account. His role as general counsel involved overseeing a team of lawyers who worked on the PPMs – the evidence showed nothing more than that. The PPM checklists showed that others were responsible for the review of PPMs. AER 4663-4667, 4684-4685. Josh Hoffman testified that he did not think Mr. Ellison was the person responsible for reviewing them in the legal department (JER 7582) and gave uncontradicted testimony that PPMs were prepared by in-house **and** outside counsel. Merriah Harkins, using her own words, testified that the basis of Mr. Ellison's responsibility for reviewing PPMs was "because he managed attorneys that were involved in the process." JER 3190.

**Alleged Fraud No. 2: DBSI misused accountable reserves by using them for general operations.** No one testified that Mr. Ellison had anything to do with accountable reserves or any alleged misstatements regarding accountable reserves. The government's attempt to link him to this alleged fraud relied completely on the testimony of Gary Bringhurst, former Chief Operating Officer of DBSI and a government cooperating witness. Bringhurst claimed he had one discussion with Mr. Ellison about "just understanding how [accountable reserves] worked." JER

10

4218-4220. No other details about the conversation were given. The government produced no additional testimony or evidence addressing this issue.

**Alleged Fraud No. 3: The Master Lease portfolio was sustaining itself when in fact it was cash flowing negative.** Mike Attiani, DBSI's former Vice President of Property Management, testified that Mr. Ellison attended asset management meetings where Attiani's reports about the master lease portfolio's performance were presented. JER 1046-1047. He admitted his reports showed cash flow, that there was a difference between cash flow and profit and loss, and that the master lease portfolio could have been profitable even when his reports showed negative cash flow. JER 1021-1028. Mr. Attiani admitted that reasonable adjustments would change the cash flow numbers in his reports from negative to positive. JER 1036-1044. In the light most favorable to the government, Mr. Attiani's testimony showed that Mr. Ellison attended some of these meetings, nothing more. Gary Bringhurst testified that he did not remember Mr. Ellison attending often or as a frequent attendee. JER 4132.

Mariah Harkins testified that Mr. Ellison did not send her information about the entire master lease portfolio when requested. JER 3009. She never testified that Mr. Ellison had the authority to distribute this information or that he personally decided to refuse to provide it to her. To the contrary, she admitted that

11

Mr. Ellison never showed hesitation in distributing financial information throughout the company (JER 2966) and said "Mark Ellison always seemed very encouraging that he wanted to be able to provide that level of transparency. So ultimately, [they] would have a meeting with Doug and discuss it." *Id.*

Ms. Harkins never directly or indirectly claimed Mr. Ellison tried to hide information from her. Ms. Harkins said she met with Mr. Ellison and others to convince Doug Swenson to release information about the entire master lease portfolio, and that not releasing the information "was a decision made by Doug Swenson." JER 2975, 2980. She never received the summary spreadsheet she requested because it was "Doug Swenson's final decision." JER 2986.[4]

In the light most favorable to the government, no evidence is still no evidence.

**Alleged Fraud No. 4: DBSI's claim of a net worth of $105 million dollars represented loans owed to DBSI by tech companies netted against the monies DBSI owed to its note and bond holders.** The government alleged DBSI's claim to a net worth of $105 million dollars was fraudulent because of the practice of "netting," in which loans owed to DBSI by tech companies were offset

---

[4] Mr. Swenson's reasons for deciding against this kind of disclosure were valid and non-criminal and are explained in the Appellants' Joint Opening Brief, ARGUMENT, Section I.E.2.b.

against liabilities. The government failed to prove the netting practice was fraudulent or that Mr. Ellison was responsible for or participated in the practice.

Matt Duckett, former Director of Accounting, testified that he was strongly opposed to the netting practice, but didn't think it was fraudulent or done to deceive investors. JER 5606. Mr. Duckett testified he took his concerns about netting to Mr. Ellison because he felt Mr. Ellison would be empathetic, and that they worked together to eventually end the netting practice. JER 5600-01, 5621.

Mr. Duckett testified that when he sent Mr. Ellison an email with a news article about arrests in the real estate industry because of false financial statements, Mr. Ellison initiated meetings to discuss compliance with DBSI employees and used the article as a jumping off point for discussions. JER 5608-5611, 5616-5620, 5689.

**Alleged Fraud No. 5: The failure to disclose DBSI's financial position following the Spectrus sales shutdown**. The government claim that DBSI fraudulently concealed its true financial position after the shutdown of Spectrus and failed to inform investors that it was relying on new sales to stay afloat, was disproved by its own evidence, especially as to Mr. Ellison. Hiding it from no one, DBSI issued a press release about the shutdown. AER 4657-4659.

Agent Morse testified about her memory of statements made by Mr. Ellison during an interview at the U.S. Attorney's Office on March 15, 2012. JER 6181-6188. She claimed that Mr. Ellison said the portfolio was profitable based on "new investor money" as opposed to new sales of real estate. JER 6226. However, David Nevin, defense counsel who accompanied Mr. Ellison to the interview, testified that not only did Mr. Ellison use the term "new sales of real estate" but he also had an argument with Mr. Williams, trial counsel for the government, about the use of that term instead of "new investor money." JER 6253-6254. The government asked no questions to challenge Mr. Nevin's testimony regarding the words that were used during the meeting despite the fact that other members of the government trial team were also present at this meeting. JER 6182. Even in the light most favorable to the government, the unsupported testimony of a witness found to have committed perjury is not enough to overcome the unchallenged testimony of Mr. Nevin.

Additional evidence demonstrates that Mr. Ellison disclosed additional information about the Spectrus shutdown. On October 23, 2007, Mr. Ellison made a presentation to preparers of the February 2008 Buttonwood Sponsor Report, which was made available to all broker-dealers representing DBSI investors. AER 5469-5471. This report contained the information that "DBSI's main source of

14

income rests in the purchase and sale of properties" (AER 4027-4078 at 47), which is consistent with Mr. Ellison's statements about DBSI being dependent on new sales of real estate. Instead of concealing this information, Mr. Ellison was giving it to people who had a legal and contractual obligation to convey the information to investors.

## IV. Exculpatory Testimony

Every government witness, including Mr. Bringhurst, testified that Mr. Ellison was serious about compliance and diligent in his job. JER 4431-32, 4443, 4717-18. Mr. Duckett testified that Mr. Ellison was honest, diligent, and serious about compliance. JER 5601. Ms. Harkins testified that she worked closely with Mr. Ellison on compliance and that he never asked her to lie to or deceive anyone. JER 3176. Adam Cleary, DBSI's former Director of Compliance, testified that Mr. Ellison was serious and proactive about compliance, and he never saw anything that to suggest Mr. Ellison lied to or tried to deceive anyone. JER 6938, 6940.

## V. Jury Instructions, Verdict, and Post-Trial Proceedings

At the conclusion of the government's case, Mr. Ellison moved for a Rule 29 dismissal of all counts and the district court reserved ruling until the close of evidence. JER 7203. Mr. Ellison made his own argument and joined in the

argument made by Doug Swenson. JER 7873-7900. The district court denied Mr.

Ellison's motion. JER 7936-7938.

The district court's jury instruction defining "willfully," JER 8101, read as

follows:

> "Willfully" means intentionally undertaking an act, making an untrue statement, or failing to disclose for the wrongful purpose of defrauding or deceiving someone. Acting willfully does not require that the defendant know that the conduct was unlawful. You may consider evidence of the defendant's words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted willfully.

*Id.* Defendants requested a jury instruction on good faith, which stated:

> The good faith of a Defendant is a complete defense to the charges of the indictment because good faith on the part of the defendant, is, simply, inconsistent with the intent to defraud alleged in the Indictment. A person who acts, or causes another person to act, on a belief or an opinion honestly held is not punishable under this statute merely because the belief or opinion turns out to be inaccurate, incorrect, or wrong. And again, that should be is not punishable under these statutes. This does apply to all of the charges. An honest mistake in judgment or an error in management does not rise to the level of intent to defraud. A defendant does not act in "good faith" if, even though he honestly holds a certain opinion or belief, that defendant also knowingly makes material false or fraudulent pretenses, representations, or promises to others. While the term "good faith" has no precise definition, it means, among other things, a belief or opinion honestly held, an absence of malice or ill will, and an intention to avoid taking unfair advantage of another. The burden of proving good faith does not rest with the defendant because the defendant does not have any obligation to prove anything in this case. In determining whether or not the government has proven beyond a reasonable doubt that the defendant acted with an intent to obtain

16

money or property by means of false or fraudulent pretenses, representations, or promises, or whether the defendant acted in good faith, the jury must consider all of the evidence in the case bearing on the defendant's state of mind. A belief that a victim will be repaid and will sustain no loss, even if that belief is held in good faith, is not a defense.

AER 608-610. There were also two additional proposed jury instructions on good faith. JER 8062. Doug Swenson argued that the court's instructions were inconsistent with the law and would hamper Defendants' arguments. *Id.* After proposing several revisions to the proposed jury instructions, Mr. Ellison made it clear that Defendants were requesting the good faith instruction they initially proposed, stating "I think that record is clear that what we're really requesting is the good faith instruction that was submitted to you" (JER 8072) and the court refused to give the instruction. JER 8079. Defendants filed a motion asking the district court to reconsider its refusal to give their proposed good faith instruction. AER 602-607. The district court denied the motion. JER 8145-8149. No good faith instruction was given to the jury.

The jury returned a verdict finding Mr. Ellison guilty of forty-four counts of securities fraud, but only under the third of three theories argued by the government, namely that he engaged in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person. AER 382-599. Mr. Ellison was acquitted of all conspiracy and wire fraud charges. *Id.*

Mr. Ellison filed a motion pursuant to Rule 29 arguing that there was insufficient evidence to support the counts of conviction and joining in arguments made by co-defendants in their similar motions. AER 282-289. Mr. Ellison joined in the argument made by Jeremy Swenson, challenging the district court's use of Jury Instruction No. 30 to define willfully based on a concession by the solicitor general in its certiorari petition in *Ajoku*.[5] *Id.; see* AER 302-311. The district court denied Mr. Ellison's Rule 29 motion, as well as those of the other co-defendants. AER 21-48. The district court denied all motions. *Id.*

## SUMMARY OF ARGUMENT

Mr. Ellison's convictions on all counts should be reversed. The jury acquitted him of committing securities fraud by making a false statement and of committing securities fraud by participating in a scheme to defraud. Mr. Ellison's conviction on the third prong of securities fraud (engaging in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person) rests on grossly deficient evidence. The government presented no evidence to prove that Mr. Ellison acted "willfully." The government presented the testimony of twenty-eight witnesses during Mr. Ellison's lengthy trial and not one witness testified that he or she believed or had proof that Mr. Ellison

---

[5] AER 213-217.

18

committed fraud or knew about any fraud that was allegedly committed. Because the evidence against him was insufficient in every respect, his conviction should be reversed.

Additionally, Mr. Ellison is entitled to reversal because the district court abused its discretion in failing to offer his proposed good faith instruction. The district court did not adequately instruct the jury on intent with the instruction that was given and thereby erred in failing to give the good faith instruction requested by the defendants. Further, the definition of willfully that was given to the jury in the pattern instructions did not include the requirement that the defendants' have knowledge that their conduct was unlawful. There has been a sea change in the definition of willfully within the Ninth Circuit after the decision in *Ajoku v. United States*, 134 S.Ct. 1872 (2014), and the new definition of willfully was applicable here.

Finally, refusal by the district court to allow questions about potential bias relating to members of the LDS faith was an abuse of discretion constituting reversible, therefore, reversal is required.

## STANDARD OF REVIEW

There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the government, a rational jury could have found the

elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Given the motions to dismiss at the end of the government's case, this Court reviews the district court's denial of the motion de novo. *United States v. Munoz*, 233 F.3d 1117, 1129 (9th Cir. 2000).

A district court's formulation of jury instructions is reviewed for an abuse of discretion. *United States v. Franklin*, 321 F.3d 1231, 1240-41 (9th Cir. 2003). Whether a jury instruction misstates elements of a statutory crime is a question of law and reviewed de novo. *United States v. Patterson*, 292 F.3d 615, 629-30 (9th Cir. 2002). Whether a jury instruction adequately covered a defendant's proffered defense is reviewed de novo. *Id.* at 629.

## ARGUMENT

**I.    Mr. Ellison's Convictions Should Be Reversed Because the Government Failed to Offer Sufficient Evidence to Convict Mr. Ellison of Securities Fraud[6]**

This Court uses a two-step approach when evaluating claims of insufficient evidence. *United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010) (en banc). First, this Court is required to "construe the evidence at trial in the light most favorable

to the prosecution." *Id.* at 1161.  Only then may this Court determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Therefore, evidence will be "insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the government's case." *Nevils*, 598 F.3d at 1167.  Even when drawing all inferences in favor of the government, the testimony still must be viewed in its entirety.  Drawing inferences in favor of the government does not mean that this Court only considers testimony on direct examination; both direct and cross-examination testimony must be considered.  If, after considering all of the testimony, it is clear that the government's case rests solely on "mere speculation" and that no reasonable inferences can be drawn in the government's favor, the evidence is insufficient to sustain a conviction.  *See id.* at 1167.

The jury instruction given by the district court laid out the government's burden:

---

[6] Mr. Ellison does not concede the legitimacy of the government's claims about the alleged "five frauds."  If the government had proved the alleged frauds, there was still no evidence to tie him to any fraudulent scheme or behavior.  Mr. Ellison adopts the legal arguments made by David Swenson and Jeremy Swenson regarding the requirement for sufficient proof for conviction in their individual opening briefs.

In order for a defendant to be found guilty of one or more of the securities-fraud charges, the government must prove each of the following elements beyond a reasonable doubt with respect to each count:

First, the defendant willfully:
a. used a device or scheme to defraud someone;
b. made an untrue statement of material fact or failed to disclose a material fact that resulted in making the defendant's statements misleading;
c. or engaged in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person, with all of you agreeing as to at least one of these three: a, b, or c;

Second, the defendant's acts were undertaken, the statement was made, the failure to disclose was done, or the deceptive practice was engaged in connection with the purchase or sale of the specific security offering alleged in the count under consideration;

Third, the defendant directly or indirectly used a wire transmission or the mails in connection with these acts; and

Fourth the defendant acted knowingly.

JER 8100-8101. The district court went on to define "willfully" in the context of

securities fraud:

"Willfully" means intentionally undertaking an act, making an untrue statement, or failing to disclose for the wrongful purpose of defrauding or deceiving someone. Acting willfully does not require that the defendant know that the conduct was unlawful. You may consider evidence of the defendant's words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted willfully.

JER 8101.

Mr. Ellison was only convicted of the third prong of securities fraud.

## A. The Securities Fraud Counts Required Proof that Mr. Ellison Acted Willfully

The government was required to prove beyond a reasonable doubt that Mr. Ellison *willfully* engaged in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person. Even if there was sufficient proof that some at DBSI were engaged in illegal behavior, the simple fact of Mr. Ellison's employment by DBSI is not enough to sustain a conviction. Even assuming, *arguendo,* that the government had proven during trial that DBSI operated as a fraud and that Mr. Ellison was engaged in DBSI's business, it offered no evidence that Mr. Ellison intentionally undertook any actions at DBSI or intentionally failed to disclose any information for the wrongful purpose of defrauding or deceiving anyone. In fact, the testimony showed that he was serious about compliance and was focused on a proper purpose of good and complete disclosure and compliance.

Evidence is insufficient to support the mental state element if it "does not make the government's incriminating explanation any more likely than [the defendant's] innocent explanation." *United States v. Esquivel-Ortega*, 484 F.3d 1221, 1227 (9th Cir. 2007) (reversing conviction). If the jury could have accepted a culpable explanation consistent with the proof of defendant's conduct, this Court

23

must assume, in favor of the government, that the jury did so. *United States v. Goyal*, 629 F.3d 912, 919 (9th Cir. 2010) (citing *Nevils*, 598 F.3d at 1167). But, "[T]he government nonetheless must offer *some* evidence to support a culpable explanation." *Id.* (emphasis in original). "[W]here there is a total failure of proof of the required mental state, [this Court] cannot affirm a conviction." *Goyal*, 629 F.3d at 919 (citing *Nevils*, 598 F.3d at 1167) (internal quotation marks omitted).

## B. The Government Failed to Present Sufficient Evidence that Mr. Ellison Acted Willfully

Each count required the government to prove beyond a reasonable doubt that Mr. Ellison acted willfully. The evidence presented by the government falls woefully short of meeting this standard. No one testified that Mr. Ellison did anything fraudulent, or asked them to lie to or deceive any investor; no statements made by Mr. Ellison indicated that he was involved in any fraud; and no documents were presented that suggested Mr. Ellison was willfully engaged in a business that operated as a fraud on investors. The government's attempts to prove Ellison's guilt depended on innocuous facts and speculation, which are just as easily subject to an innocent explanation as a guilty one. *See Esquivel-Ortega*, 484 F.3d at 1227.

The government's allegations against Mr. Ellison as argued (5 frauds) or as charged were not supported by evidence sufficient to sustain a conviction on

securities fraud. The facts as outlined above demonstrate the government's failure to meet its burden.

Mr. Ellison's position as general counsel did not provide proof of a culpable state of mind. The contention that Mr. Ellison worked in compliance and was therefore automatically responsible for any alleged compliance failure is not supported by law or facts. *See Goyal*, 629 F.3d at 919 ([The defendant's] presumed knowledge . . . as a qualified CFO does not make him criminally responsible for his every conceivable mistake.).

The government's cooperating witness Gary Bringhurst failed to offer any testimony that could be construed to show that Mr. Ellison committed any crime. His most "damning" testimony about Mr. Ellison? He claimed that his feeling "was that [Mark] just didn't want to know exactly what the . . . financial picture was." about DBSI's cash situation." JER 4188. This "feeling" he attributed to Mr. Ellison is no more than "baseless speculation by a cooperating witness [that] is not proof of fraudulent intent." *Goyal*, 629 F.3d at 921.

Finally, exhibits also demonstrated that Mr. Ellison did not willfully engage in conduct that operated as a fraud: Trial Exhibit 7452 (AER 5468) is an email in which Mr. Ellison indicates his desire for additional disclosure in a 2008 DBSI offering. Trial Exhibit 6315 (AER 4730) is an email showing Mr. Ellison believed

that DBSI affiliates should only be involved with a broker-dealer who showed respect for the law and seriousness about compliance. Finally, Trial Exhibit 5615 (DJMSER 39) is an email written by Mr. Ellison to the DBSI compliance department that provides the best example of Mr. Ellison's approach to the job:

> I am concerned that compliance (which would include the legal function) is being viewed as an "adversarial" role instead of a "complementary" role. I know there is a fine balance that must be reached. Those who intentionally violate the FINRA rules and regulations should look at compliance with fear and trepidation. But those who are legitimately trying to do things right should look at compliance as a partner and someone that they could go to for help and support.

Rather than demonstrating willful participation in a fraud by Mr. Ellison, the testimony and documentary evidence that was presented over the course of trial represents a "total failure of proof of the required mental state." *Goyal*, 629 F.3d at 919.

The district court and government both noted at sentencing that, had Mr. Ellison simply quit his job, he could have avoided a conviction for securities fraud. JER 9027, 9074-75. If this Court allows these convictions to stand on the current evidence, it is essentially allowing for the conviction of any person that works at a business that is allegedly fraudulent. Failure to overturn Mr. Ellison's conviction on this evidence would eliminate the mental state of "willfully" from the third prong of securities fraud. If there is no mental state required and one

could be convicted of securities fraud for merely being employed in a business that ended up being fraudulent, many innocent people could be charged with crimes they had no intent to commit.

Here, Mr. Ellison is being punished for his honest attempts to increase compliance at DBSI by being convicted of a crime that he did not possess the requisite mental state to commit. He continually worked for good and proper purposes not the wrongful purpose of defrauding or deceiving someone.

Based on the foregoing, all counts should be reversed for lack of evidence that Mr. Ellison acted willfully for the wrongful purpose of defrauding or deceiving investors.

## II. The District Court Erred in Refusing to Give Defendants' Proposed Good Faith Instruction

The district court erred in failing to give Defendants' proposed good faith instruction. The failure to give the requested instruction, and inadequate instructions on the requisite intent required for the crime charged (*see* Section III below), constituted an abuse of discretion that entitles Mr. Ellison to a new trial. The jury only convicted Mr. Ellison of the third prong of securities fraud. Had the proposed good faith instruction been given, the jury's acquitting verdicts would have extended to the third prong of Securities Fraud because the evidence was overwhelming that he acted in good faith during his time working at DBSI.

This Court has found that "case law is well settled that a criminal defendant has no right to any good faith instruction when the jury has been adequately instructed with regard to the intent required to be found guilty of the crime charged, notwithstanding the normal rules governing theory of defense requests" *United States v. Shipsey*, 363 F.3d 962, 967 (9th Cir. 2004) (internal quotation marks omitted). This Court reviews "de novo whether the district court's instructions adequately presented the defendant's theory of the case." *United States v. Knapp*, 120 F.3d 928, 930 (9th Cir. 1997). However, the "precise formulation" of the instruction is reviewed for abuse of discretion. *United States v. Dixon*, 201 F.3d 1223, 1230 (9th Cir. 2000).

In the instant case, Defendants were entitled to a good faith instruction because, although the district court instructed the jury on the *mens rea* elements of "willfully" and "knowingly," its refusal to give the proposed good faith instruction meant that the instructions regarding intent to defraud were inadequate. As stated by counsel for Doug Swenson, "good faith does not go to the issue of the defendants' state of mind of knowing or knowingly. It goes to the issue of intent to defraud." JER 8062-8063. Counsel was very clear that the good faith instruction proposed by Defendants was proposed because it "states very specifically that the good faith of the defendant is a complete defense to all charges involving an intent

to defraud." JER 8063. Here, because the proposed good faith instruction was not given, there was no jury instruction that explained that good faith was a defense to all the charges. The district court gave inadequate instructions on intent, and therefore erred in failing to give a good faith instruction.

Furthermore, Mr. Ellison contends that the district court erred in refusing to give Defendants proposed good faith instruction because the definition of willfully given to the jury was inadequate.[7] The jury instruction on the definition of willfully given in the instant case inadequately instructed the jury on intent because

---

[7] This argument was properly preserved for appeal. This Court has held that "[o]ffering an alternative instruction along is not enough [to preserve an objection for appeal]; the district court must be fully aware of the objecting party's position." *United States v. Williams*, 990 F.2d 507, 511 (9th Cir. 1993). In order to preserve the right to appellate review "a defendant must have objected before the jury retired, stating *distinctly* the matter to which he objected and the *grounds* of the objection." *United States v. Kessi*, 868 F.2d 1097, 1102 (9th Cir. 1989). As discussed above, Defendants did not merely offer an alternative instruction, rather they made the district court fully aware of their position on the requisite state of mind for the charge. JER 8062-63, 8069-72, 8079-80. Although Defendants explained their position that the good faith instruction was needed to correctly instruct the jury on the intent required to commit the offense. The issue has been properly preserved and the challenged jury instruction is subject to review under an abuse of discretion standard.

it did not require that the jury find that Defendants knew their conduct was unlawful.[8]

In *United States v. Ajoku*, 718 F.3d 882 (9th Cir. 2013) (cert. granted, vacated and remanded by 134 S. Ct. 1872 (U.S. 4/21/2014), the Ninth Circuit affirmed a jury conviction for making false statements relating to health care matters in violation of 18 U.S.C. § 1035, holding that in the context of false statement crimes, willfulness means "deliberately and with knowledge" and does not require knowledge of unlawfulness. *Ajoku*, 718 F.32 at 879. Ajoku petitioned for certiorari to the United States Supreme Court. The government, through the Solicitor General, confessed error and asserted that the correct definition of willfully would require the government to prove that the defendant knew his conduct was unlawful. The Supreme Court granted the writ and remanded *Ajoku* to the Ninth Circuit "for further consideration in light of the confession of error by

---

[8] This argument was made by counsel for Jeremy Swenson in his June 6, 2014 Brief in Support of Motion for Acquittal and New Trial, Dist. Ct. Dkt. No. 547 at 17-22 (AER 302-311), and Mr. Ellison expressly adopted all arguments made by counsel for codefendants in his June 9, 2014 Motion for Acquittal and New Trial. Dist. Ct. Dkt. No. 554 at 1-2 (AER 282-289). Accordingly, it was properly raised below.

the Solicitor General in his brief for the United States filed on March 10, 2014."

*Ajoku v. United States*, 134 S. Ct. 1872 (2014).[9]

In *Ajoku* the government admitted that acting willfully required proof that the defendant knew his conduct was unlawful.

> The government now agrees that the correct interpretation of "willfully" in Section 1035 is the one articulated in *Bryan v. United States*, 524 U.S. 184 (1998). To find that a defendant "willfully" made a false statement in violation of Section 1035, a jury must conclude "that he acted with knowledge that his conduct was unlawful." *Id.* at 193. The same interpretation should apply to 18 U.S.C. 1001's materially identical prohibition on "knowingly and willfully" making a false statement in a matter within the jurisdiction of the federal government.

AER 213-237 (Dist. Ct. Dkt. No. 745-1 at 10).

There is no reasoned basis to have a different meaning for willfully for the crimes of false statements relating to health care under § 1035, fraud or false statements under § 1001, and securities fraud. In each of those statutes, the jury must find that the defendant knew his conduct was illegal. In Mr. Ellison's case, the jury was repeatedly instructed exactly the opposite, to wit, that the defendant did not have to know that his conduct was unlawful.

This interpretation of the definition of willfully is not foreclosed by this Court's decision in *United States v. Tarallo*, 380 F.3d 1174 (9th Cir. 2004).

---

[9] The Solicitor General's certiorari petition is included in the district court docket

*Tarallo* is not an analogous situation because *Tarallo* was convicted of securities fraud and mail fraud based on false statements.  *Tarallo*, 380 F.3d 1174, 1181. The definition of willfully advanced by the Solicitor General in *Ajoku* should be applied to Mr. Ellison's security fraud convictions, because Mr. Ellison was <u>only</u> convicted under the theory that he "engaged in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person." AER 382-599.  This Court has not yet analyzed how willfully would be defined under the "course of business" theory.

### III.  The District Court Abused Its Discretion When It Refused to Allow Any Questions About Jurors Bias Towards Members of the LDS Faith

…if there is a juror who has strong feelings about members of the LDS faith—and it can go—believe me, it can run the gamut: people who are not LDS who have negative or very positive opinions about people who are LDS, and it can be members of the LDS faith who either feel so strongly in a positive way about members or feel—again, using Mr. Robinson's example of his mother, may feel that you should hold yourself to a higher standard.  That's why—it's not an issue in the case, but it is an issue in the case if somehow a juror figures out that either a witness or the defendants are LDS.

(U.S. District Court Judge Lynn Winmill discussing the existence and potential impact of bias related to LDS members during hearings about jury selection*;* AER 5754).

---

at docket number 745-1 (AER 213-237).

The district court found the presence of significant bias relating to members of the LDS faith, yet it forbade counsel from asking any questions about this issue during voir dire. AER 5751-5764. The refusal to allow questions about potential bias against members of the LDS faith was an abuse of discretion constituting reversible error.

Voir dire is critically important to ensure a defendant's Sixth Amendment right to an impartial jury. *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). Federal judges have discretion in determining the best methods for conducting voir dire. *Id.* at 189. "Failure to ask specific questions will be reversed only for abuse of this discretion. Abuse of discretion will be found, however, if the questioning is not reasonably sufficient to test the jury for bias or partiality." *United States v. Jones*, 722 F.2d 528, 529 (9th Cir. 1984) (citing *United States v. Baldwin*, 607 F.2d 1295, 1297 (9th Cir. 1979)).

For most issues involving jury selection the party requesting specific voir dire has the burden of showing that each question "is reasonably calculated to discover an actual and likely source of prejudice, rather than pursue a speculative will-o-the-wisp." *United States v. Robinson*, 475 F.2d 376, 381 (D.C.Cir. 1973); *see also United States v. Toomey*, 674 F.2d 678, 682 (9th Cir. 1985).

The Ninth Circuit has identified three situations where the failure to ask specific voir dire questions require a different analysis.  Those situations are:

> (1) When the case carries racial overtones; (2) when the case "involves other matters concerning which either the local community or the population at large is commonly known to harbor strong feelings that may stop short of presumptive bias in law yet significantly skew deliberations in fact"; or (3) when the case involves other forms of bias and distorting influence which have become evident through experience with juries.

*Jones*, 722 F.2d at 529-30 (internal citations omitted) (quoting *Robinson*, 475 F.2d at 381.

When proposed voir dire questions relate to one of these topics, the burden shifts to the government to "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24 (1987).  When applying this inquiry, the question "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error."  *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) (emphasis in original).

Religious bias falls squarely within the second class of cases and the government will not show beyond a reasonable doubt that the failure to allow

specific voir dire questions about potential bias relating to members of the LDS faith did not impact the verdict.  Reversal is required.

### A.  The Most Powerful Evidence of Bias Relating to LDS Members Was Fact Based and from a Credible Source

In *Robinson*, the second class where specific voir dire questioning is necessary includes cases where there could be "prejudice against . . . a member of a religious minority."  *Robinson*, 475 F.2d at 381, n.9 (citing *United States v. Daily*, 139 F.2d 7 (7th Cir. 1943) (allowing voir dire on bias against members of the Jehovah's Witness faith).  The evidence of real, not imagined prejudice against LDS members came from the findings of the district court.  Nothing in the record contradicts those findings.

The district court judge, himself a member of LDS faith, Sentencing transcript, Gov't Excerpts of Record Volume 40, JER 9077, described the existence of bias related to LDS members based in the local community and the population at large:

> But if, indeed, the evidence does come out in a way that suggests that the defendants are all members of the LDS faith -- and I don't know that; I am assuming something along those lines because the question was put into the questionnaire -- or that they use their connections within the LDS church as part of their investment strategy. I just don't know. If something like that does come into evidence -- and I think the last election gave us some sense that there is still not just LDS/non-LDS, but -- in this country; it's Muslim/non-Muslim.  Forty

years ago, fifty years ago, it was Catholic/non-Catholic.  It is always of concern that that is still an issue, I think, in the American society.

JER 120-209 (Dkt. 316, at 34-35).

The district judge described how easy it would be for jurors to discern that Defendants are members of the LDS faith:

> The problem is that, you're right, race typically is more obvious, but not always.  It may come up in the course of a trial in ways that are somewhat—will surprise you.  But with regard to religion, within I think probably every faith and certainly within the LDS faith, I think it's true that there are certain—I don't know if the word 'tell' or a buzzword or things that people will pick up on…I mean, I can tell you one of the jurors said they teach early-morning seminary.  I can tell you beyond a shadow of a doubt that person is LDS.  Now—so that if during testimony something is said completely innocent and without any direct reference to religion, it is entirely possible that it will be immediately apparent to some jurors that either the witness or the defendants are LDS.

AER 5755.

Finally, the district court explained the danger of failing to discover bias against members of the LDS faith during voir dire:

> [a]nd that's where the problem is, that you can't control that. And you won't know until it's too late. Because by that time, if we have a juror who has those preconceived feelings, then we'll be in the middle of the trial and it's too late at that point to exclude the juror. So that's where the concern is.

*Id.*

**B.     The Decision in *United States v. Anekwu* Provides No Assistance to the Government Because the Factual Record is Different**

In *United States v. Anekwu*, 695 F.3d 967 (9th Cir. 2012) this Court found that the district court did not abuse its discretion in refusing to ask specific voir dire questions about jurors' potential bias towards Nigerians. *Anekwu*, 695 F.3d at 978-81. Anekwu argued that his case fell into the second class of cases requiring specific voir dire questions, "because the American population harbors strong feelings that may skew deliberations" and in the alternative "that there was a potential (not speculative) source of prejudice that his questions were reasonably likely to discover." *Id.* at 979.

This Court found that "Anekwu's argument that Americans associate Nigerians with fraudulent conduct is not a "matter concerning which either the local community or the population at large is commonly known to harbor strong feelings that may stop short of presumptive bias in law yet significantly skew deliberations in fact" and therefore did not fall into the second class of case in which specific voir dire questions are required. *Id.* at 980. In *Anekwu*, "the district court never indicated that it perceived a risk of . . . bias." *Anekwu*, 695 F.3d at 979. No evidence of bias other than defense counsel's statements, was presented to the district court by Anekwu. Newspaper articles showing that similar frauds were

perpetrated by Nigerians were silent as to any evidence of anti-Nigerian bias in the country at large or in the community from which the jury was drawn. This Court found that "[w]hile Anekwu has offered evidence showing that the type of fraud in question here frequently comes from Nigeria, this evidence does not prove that the population at large has prejudice against Nigerians." *Id.* at 980. More importantly, the articles were never submitted to the District Court, rather they were presented for the first time to this Court on appeal.

The record of bias related to LDS members in the instant case was provided by the trial court. The record included his observations of the community, his understanding of the significant level of bias related to LDS members in Boise and America, including the likelihood that such people would be included in the jury panel. The trial judge referred to evidence of attitudes revealed in the last presidential election. *See* JER 120-209 (Dkt. 316 at 34-35) and AER 5754-5756. The government never claimed the court was wrong about bias related to LDS members. The record of significant LDS bias is clear and unchallenged.

In *Anekwu*, the district court offered a substitute question asking if "any juror had been involved in a group that discriminated based on nationality or race" because defense counsel did not want Anekwu's nationality revealed. *Anekwu*, 695 F.3d at 980. Defense counsel did not object to the substitute question and this

Court found that the district court could have interpreted that response as a withdrawal of the request, noting that "the district court abuses its discretion under its supervisory authority if it fails to honor the *defendant's request*." *Id.* (emphasis in original).

Here Appellants specifically requested, on two separate occasions, permission to ask questions or that the district court inquire about jurors' potential bias towards members of the LDS faith. AER 5751-52, 5764. Appellants asked the district court to question the jurors about any potential bias towards members of the LDS faith. AER 5751-52. As examples of questions that could potentially be used to determine whether a juror held any bias, Appellant's suggested asking whether anyone had an issue with members of the LDS faith based on their thoughts, opinions, or experiences and whether any jurors felt they would hold a member of the LDS faith to a different standard. *Id.* at 48. Appellants indicated a desire to "try to go into [the issue] if the court would allow." *Id.* at 48. Finally, the trial court acknowledged that the defense wanted to ask questions about LDS related bias, stating "[s]o the objection is noted. You know, the request that you be

allowed to ask the question or that I ask the question, and I'm going to deny that." AER 5760. *Anekwu* provides no roadblock for Appellants here.[10]

Any argument that the defendants' LDS faith was not an issue in this case, and therefore jurors did not need to be questioned about it has also been directly rejected by the Seventh Circuit, citing *Daily*, which found that jurors may be asked questions that do not directly relate to the specific issues of the case because,

> [s]ome questions may appear tangential to the trial but are actually so integral to the citizen juror's view of the case, especially one with publicly controversial issues, that they must be explored. For example, in *Daily*, this court acknowledged the right of a defendant of the Jehovah's Witness faith to a limited inquiry into the jurors' prejudice against Jehovah's Witnesses, even though his religious faith was not an issue before the court.

*United States v. Dellinger*, 472 F.2d 340, 368 (7th Cir. 1973) (internal citations omitted).

The district court declined to ask the requested questions because it was unable to decide "a way to ask the question without injecting the issue directly into the case" and did not feel it would "be very successful at ferreting out jurors who actually have bias on this issue." AER 5760. The District Court's solution to this

---

[10] Likewise *United States v. Alarape*, 969 F.2d 349, 351 (7th Cir. 1992) provides no support for the district court decision here. Unlike here, Alarape made no suggestion that his national origin would be held against him. There were no statements from the bench about the severity of the problem, or the likelihood of the status becoming known to jurors during trial.

problem was rejected by the Fifth Circuit in *United States v. Corey*, 625 F.2d 704, 707 (5th Cir. 1980), which held that "[o]nce a party has raised the spectre of potential actual prejudice, specific and direct questioning is necessary to ferret out those jurors who would not be impartial."). The Seventh Circuit has also noted that it is a district court's responsibility to ensure that "[a]t a minimum, when requested by counsel, inquiry must be made into matters where the likelihood of prejudice is so great that not to inquire would risk failure in assembling an impartial jury." *Dellinger*, 472 F.2d at 368.

The district court found that, despite the parties' and the court's best efforts, it would be difficult to avoid reference to Appellants' LDS faith, noting "[o]bviously, membership in the LDS church is not an issue directly in this case. And if I could control it, I would keep any reference to that from even occurring during this trial, but I don't know that I can control that; I just don't know." JER 120-209 (Dkt. 316 at 34). Even the government admitted that it would be difficult to avoid references to LDS status:

> Your Honor, it's our expectation that, that is not going to be a part of this case. But in all candidness, there is a chance that it could come out, and I understand the defendant's concern about that. I guess just hearing the court and the way that you would perhaps rephrase that might make it not quite so pointed, but get to the issue of is there a potential bias or prejudice there. So that's essentially our position. We don't anticipate it coming up, but it's possible.

41

JER 120-209 (Dkt. 316 at 35-36).

The district court refused to inquire about potential bias towards LDS members. Questions about whether jurors could be fair and impartial were inadequate to discover such bias. The nature and extent of the prejudice as described and found by the district court prevents the government from meeting its burden to show that the error was harmless beyond a reasonable doubt. There was an abuse of discretion which constitutes reversible error.

### C. Evidence of Impact of District Court's Abuse of Discretion in Failing to Allow Questions

The court's concern that someone with bias against LDS members could end up on the jury and that we "won't know until it's too late" was well-founded. After the trial, the jury foreman posted on Facebook a link to a newspaper article in which he was interviewed about the verdict. In response to this post, a friend of the foreman stated "Ha! The Quorum of the Twelve just put a hit out on you. Beware!!!!!" See Exhibit A to Defendant-Appellant's Motion to Supplement the Record. Dkt. 47. In response, the foreman answered "I will be steering clear of the Temple on Easter" to which his friend responded "You haven't lived until you've had a fatwa put upon you." *Id.*

Without presuming the foreperson held a bias against LDS members, voir dire questions may have revealed attitudes or beliefs consistent with the Facebook

post. Appellants hope the government will agree that a potential juror holding an attitude consistent with these statements would not be an appropriate person to be the foreperson of the jury in this case. Appellants were denied the opportunity to explore this issue.

The Facebook evidence raises the possibility that the foreperson of the jury held anti-LDS bias, and that bias went undetected due to the district court's refusal to question the jury. Had the jury foreman's attitudes and opinions evidenced by Facebook posts been revealed during voir dire, others jurors may have agreed or disagreed, revealing their own views. The government will be unable to meet its burden to show that the district court's refusal to question the jury about bias against members of the LDS faith was harmless error. Defendants are entitled to a reversal on these grounds.

## CONCLUSION

For all of the reasons as stated above, in Appellants' Joint Opening Brief, and in the joined portions of co-Appellants' Individual Opening Briefs, the Appellant respectfully requests this Court vacate his convictions on all counts without retrial due to insufficient evidence, or, in the alternative, reverse his convictions and remand for retrial. In the further alternative, Appellant requests his

sentence of imprisonment be vacated and remand for imposition of a sentence of probation, as well as a legal restitution order.

Dated this 22nd day of February, 2016.

 s/ Jeffery P. Robinson
Jeffery P. Robinson
Attorney for Defendant-Appellant
Mark Ellison

## JOINDER IN ADDITIONAL ARGUMENTS BY CO-APPELLANTS

Co-Appellants Doug Swenson, Jeremy Swenson, and David Swenson are filing separate individual opening briefs. In addition to the arguments made in this brief, Mr. Ellison joins all of co-Appellants' arguments that are relevant to his counts of conviction, including, but not limited to:

A. Individual Opening Brief of Doug Swenson:

   1. No rational trier of fact could find that the government proved Doug Swenson operated DBSI with the specific intent to defraud.

   2. The Court erroneously excluded hearsay statements in a contemporaneously written email that directly demonstrated Appellants' lack of intent to defraud.

   3. The district court erroneously permitted the prior testimonial statements of Mr. Swenson's non-testifying co-defendants to be presented to the jury.

B. Individual Opening Brief of Jeremy Swenson:

   1. The court erred in its restitution determination.

C. Individual Opening Brief of David Swenson:

   1. Whether the district court erred in admitting evidence of non-disclosed loans.

## STATEMENT OF RELATED CASES

Appellant is unaware of any related cases other than those consolidated herewith.

## CERTIFICATE OF COMPLIANCE

## PURSUANT TO CIRCUIT RULE 32-1

Case number 14-30184

I certify that:

**Oversized Briefs**:

The court granted permission to exceed the length limitations set forth at Fed. R.
App. P. 32(a)(7) by an order dated _____
      or
An enlargement of brief size is permissible under Ninth Circuit Rule 28-4.

The brief is

X    Proportionality spaced, has a typeface of 14 points or more and contains
9,959 words

or is

___    Monospaced, has 10.5 or fewer characters per inch
and contains _____ words or _____ lines of text

or is

___    In conformance with the type specifications set forth at Fed R. App. P.
32(a)(5) and does not exceed ___ pages

Dated this 22nd day of February, 2016

      s/ Jeffery P. Robinson _____
Jeffery P. Robinson
Attorney for Defendant-Appellant
Mark Ellison

47

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 22nd day of February, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated this 22nd day of February, 2016

 s/ Andrea Crabtree
Paralegal to Jeffery P. Robinson
Attorney for Defendant-Appellant
Mark Ellison